ANN NICOLINE CHARLSON, Respondent, v. T. E. CHARLSON, N. J. Charlson, N. A. Charlson, C. C. Charlson, Ella C. Charlson, T. E. Charlson, as Administrator of the Estate of S. Charlson, Deceased; and the Charlson Estate, a Corporation, Appellants.

(197 N. W. 778.)

**Husband and wife — transactions between husband and wife closely scrutinized.**

1. Where, in an equitable action to set aside certain antenuptial and postnuptial agreements and to vacate a final decree in an estate, it appeared that after betrothal an antenuptial agreement was made, and thereafter, upon the deathbed of the husband, a postnuptial agreement was made, which deprived the wife of any interest in her husband's property or estate excepting certain statutory allowances, and made an award to the wife grossly disproportionate to the value of the estate, it is held, following the law of the case announced in a former appeal,—

That the relation of husband and wife is one of special confidence and trust requiring the utmost good faith and equity closely and rigidly scrutinizes transactions between them to the end that injustice and oppression may not result.

**Husband and wife — burden on husband and those claiming under him to show full disclosure to wife, where provision to her by nuptial agreement grossly disproportionate to value of estate.**

2. In such cases the principle of law is often applied that fraudulent concealment will be presumed and the burden of proof thrown on him, or those claiming under him, to show that full disclosure had been made where the provision made for the wife is grossly disproportionate to the value of the estate.

**Husband and wife — evidence held to sustain finding of fraudulent concealment in execution of nuptial agreements.**

3. That the trial court was warranted in finding that fraudulent concealment existed in the execution of the nuptial agreements concerned.

**Husband and wife — wife held not precluded from asserting rights by participation in probate proceedings of husband's estate.**

4. That, upon the record, the widow was not precluded from asserting her rights by participating or acquiescing in probate proceedings had concerning her husband's estate.

Note.—(1) Fraud in transactions between husband and wife, 13 R. C. L. 1367; 3 R. C. L. Supp. 142.

**Husband and wife — court held authorized to vacate final decree on show-
ing of fraudulent postnuptial agreement.**

    5. That the trial court had authority to vacate the final decree rendered in
the probate proceedings concerning the husband's estate.

Opinion filed March 3, 1924.

    Executors and Administrators, 24 C. J. § 2491 p. 1034 n. 44. Husband and
Wife, 30 C. J. § 181 p. 627 n. 33; § 197 p. 635 n. 84; § 203 p. 638 n. 65; § 204
p. 639 n. 69; § 207 p. 642 n. 27, 31, 32; p. 643 n. 42, 43; p. 644 n. 51, 52; § 232
p. 663 n. 71 New; §§ 246–247 p. 669 n. 72; § 251 p. 673 n. 29.

In District Court, Williams County, *Lowe, J.*

Action in equity to set aside antenuptial and postnuptial agreements
and a final decree in an estate.

Defendants have appealed from the judgment in plaintiff's favor
and have demanded a trial de novo.

For former opinion see 48 N. D. 851.

Affirmed.

*Craven & Converse* and *Fisk & Taylor,* for appellants.

A final decree of distribution is of equal rank with a judgment en-
tered in any other court of record in this state. Fisher v. Dolwig, 29
N. D. 561.

Such final decree of distribution is conclusive as against the bonds-
men as well as the administrator and imparts the same degree of verity
as judgments entered by a court of record.

At page 91 the court says: The decree of distribution was a judicial
construction of the will, and determination by the court as well of the
persons who were entitled to his estate, as of the proportions or parts
to which each of those persons was entitled, and was *conclusive* of
heirs, legatees or devisees, subject as to the rights only to be reversed,
set aside or modified on appeal. It is the final determination of the
rights of the parties to a proceeding. Sjoli v. Hogenson, 19 N. D. 82.

A person who stands by and allows a final decree of distribution to
be entered without in any way claiming *the exemptions* provided for
by Sections 8725 and 8727 of Comp. Laws 1913, and who does not seek
to have said judgment set aside or modified by said county court, and
does not appeal therefrom, may not afterwards question the validity of

such judgment on grounds which could have been presented on such appeal. Fisher v. Dolwig, 39 N. D. 161.

Before a court of equity will interfere even with an inequitable judgment, it must appear that the injured party has used due diligence in presenting the matter to the court, and in doing whatever lies in her power to protect his interests. Not only is negligence not a ground for granting relief, *but it is a ground for refusing relief,* and the general rule is that a party seeking aid from a court of equity from judgments at law *must be without* fault; or *negligence,* and if he is negligent or careless—the doors of chancery will remain closed and relief will be denied. Under this rule *it has been held to be negligence not to employ an attorney.* 15 R. C. L. 740, § 195.

A decree of distribution of an estate will not be set aside unless the fraud or mistake on account of which the relief is prayed is *extrinsic* or *collateral* to matter which was tried by court.

Decree though erroneous is as conclusive against one who fails to appear, having an opportunity to do so as it is against a party whose fault produced the error.

Where negligent failure of attorney for the executor to apprehend effect of a certain statute making a charitable bequest void when testator dies within thirty days of making the will, and negligence of the executor, who knew of the statute and its effect, but signed petition for distribution without reading it and estate was distributed according to the will and as petitioned for,—

Held that decree of distribution will not be set aside at suit of an heir, *who claims she relied on the executors and their attorneys* to procure a proper distribution, and who failed to appear or object. McGavin v. San Francisco, etc. Soc. (Cal.) 167 Pac. 182.

The county court has power to pass upon, construe, and did pass upon and rightfully gave effect to said contract in decree of distribution and plaintiff is bound thereby. A court of equity will not direct, advise or control, county court.

Whatever may be the rule elsewhere, under the Constitution and statutes of this state the county court shall have exclusive original jurisdiction in probate and testamentary matters—the settlement of the accounts of executors and administrators. N. D. Const. § 111.

At page 92, the court says: "Under our probate system, all deraign-

ment of title to property of deceased persons is through *the decree of distribution* entered as a final act in the administration of an estate whether testate or intestate. *No one will contend that this decree can be made by any other court or in any other proceeding."* Sjoli v. Hogenson, 19 N. D. 82.

The question of the indebtedness of the estate to the claimant, and the amount of such indebtedness, if any, cannot be an issue in the equitable action; and the judgment in such action should not pass upon such question, or find such indebtedness, but leave that for the determination of the county court or district court on appeal. Johnson v. Rutherford, 28 N. D. 87.

Within the limitations incident to the subject matter specified in the Constitution, our probate court possesses superior and general jurisdiction, and have implied power to do whatever is reasonably necessary to carry out the powers expressly given. Fisk v. Lamton, 125 Minn. 83, 144 N. W. 445.

While they (the probate courts) have no general equity powers, yet as respects the subjects committed by the constitution to their exclusive jurisdiction, they have the plenary powers, legal and equitable, that any court has. State v. Brown, 113 Minn. 1, 129 N. W. 139.

A county court has jurisdiction to determine whether defendant devisee had made his election to take, contrary to, or under the terms of, the will, though the matter is equitable cognizance.

Gates, J. says: The overwhelming weight of decisions under such definition of authority, (constitutional powers of county courts), is to the effect that such courts have such equitable jurisdiction as may be necessary to the exercise of their proper functions. Re Prepost (S. D.) 168 N. W. 630.

1. Antenuptial contracts are not against public policy, but are regarded with favor as conducive to the welfare of the parties making them, and will be sustained whenever equitably and fairly made.

2. Fraud will be presumed when there has been a transaction between parties occupying fiduciary relationship, whereby one in whom confidence was reposed, or who possessed controlling influence over the other, obtained benefit without consideration, or for an inadequate consideration. The onus is on the person obtaining such benefits to show that he acted righteously.

3. There can be no valid contract between two persons except after full and fair communication and explanation of every material particular within the knowledge of the one who seeks to uphold it against the other, *if it appears the former possessed influence which he abused or had gained confidence which he betrayed.*

4. In determining the validity of contracts between parties when one stands in a fiduciary relation to the other, inadequacy of consideration is an important factor; *but no obligation rests upon a man about to marry to secure his prospective wife a due proportion of all his property,* under penalty, if he does not, of having his contract with her decreed prima facie a fraud on his part.

5. The relations of a man and a woman betrothed to one another *are presumably, but not invariably, confidential.* Under the evidence the trial court was not bound to find that the parties to the antenuptial contract here involved occupied a confidential relationship when it was executed. Malchow v. Malchow, 143 Minn. 53, 172 N. W. 915.

A person who stands by and allows a final decree to be entered, without in any way claiming the exemptions provided by Sections 8725 and 8727 of C. L. 1913, and who does not seek to have said judgment set aside or modified by said county court, and does not appeal therefrom, may not afterwards question the validity of such judgment on grounds which could have been presented on such appeal. Fisher v. Dolwig, 39 N. D. 161, 166 N. W. 793.

*Kvello & Adams,* for respondent.

We are of the opinion further that the complaint states the cause of action in equity for allowance of the widow's exemptions. To secure such allowance this action in equity based upon grounds of fraud, deception or misrepresentation is available and in an action or proceeding in county court to vacate the final decree after the lapse of one year. Reichert v. Reichert, 41 N. D. 253, 170 N. W. 621.

The defendants admit that the county court should have allowed the widow her exemptions; their contention is that the county court may now do so by correcting the final decree nunc pro tunc.

A decree of final distribution while ordinarily conclusive upon the parties in interest unless appealed from, may, nevertheless, be vacated or modified on motion in the lower court, at any time within the six months allowed by the statute therefor, upon a proper showing of mis-

take, surprise, inadvertence, inexcusable neglect, or the like; but after the expiration of six months the probate court has no power to grant relief; thereafter the only remedy of the party is by independent suit in equity. The law is settled that the remedy by motion is merely cumulative, and does not displace the jurisdiction of a court of equity to review a decree of distribution, upon a showing that it was procured by extrinsic fraud or mistake, whereby the court and the losing party were imposed upon or misled, and to enforce an involuntary trust against those who have hereby gained an inequitable advantage. But equity will not grant relief for mere error. Moore v. Palmer, 43 N. D. 99, 174 N. W. 93.

Antenuptial agreements made prior to marriage between the parties about to be married concerning and respecting their individual and separate property may be upheld as valid as to property exclusive of the homestead exemption as defined by the laws of North Dakota, but of the homestead exemption such antenuptial agreements are void as being contrary to public policy and welfare and the protection of the home, and such homestead exemption cannot be waived before the arrival of the appropriate time of claiming it. Swingle v. Swingle, 36 N. D. 610, 162 N. W. 912.

The entire absence of proof for plaintiff has been held in the case as cited and in cases from other jurisdictions, (cases quoted), to impose upon the husband the burden of showing, if he would sustain the contract, that there was no fraud or concealment, and that the prospective wife knew the extent, character and value of the prospective husband's property to the nature and the extent of her rights as his wife and widow. Welch v. Welch, 184 N. W. 38.

When a suit to set aside an antenuptial agreement because of the disproportion between the provisions for the wife therein and the husband's means, evidenced that the wife had been told by the husband prior to the making of the agreement that he was a banker, a large land owner and wealthy, did not discharge the burden upon those claiming under the husband, under the agreement showing that the wife had full knowledge as to the nature, character and extent of the husband's means at the time as the terms quoted were too indefinite and general to charge her with knowledge of the kind and the amount of the property possessed by him. Warner v. Warner (Ill.) 85 N. E. 630.

The confidential relations continue after marriage. The wife is still presumed to be under the husband's influence. Equity guards with jealous care the rights of a wife who, without competent and independent advice surrenders rights secured to her by statute, under an agreement with the husband. Mere silence and lack of protest during his lifetime, considering the ages of the parties and the circumstances shown in the case, should not arouse any presumption against her. The peril of inaction, if any, was his. His representatives may not invoke her silence against her under such conditions.

Silence alone will not constitute an estoppel unless it appears that it is known that it will be acted upon to the injury of the other party, or is maintained with a deliberate intention to deceive or to obtain an advantage. The burden of proving the facts to establish it is upon those who claim it. Denison v. Dawes, 117 Atl. 314; 96 Am. St. Rep. 707; 10 R. C. L. 693, art. 21.

The marriage contract unfair to the wife in its terms was set aside because of the failure of the representatives of the husband to show that it was understood by the wife at the time she signed it. Mazes v. Mazes, 99 S. W. 336.

There is no rule of law which would render insufficient the testimony of the widow alone to prove fraud practiced on her in procuring the marriage contract, where the testimony is artless and honest and is corroborated in several important particulars. 21 Cyc. 1269.

In a proceeding for the administration of the property of a decedent, a county court is without jurisdiction to determine the validity of an antenuptial settlement had between deceased and his widow. Wilson v. Wilson, 132 Pac. 67.

No question is here raised by the plaintiff as to any fraud, accident or mistake in the execution of the instrument; but on the contrary she is asking to sustain it and therefore it is not one of the situations peculiarly within the province of equity so that a court of chancery is necessarily called upon to exercise its inherent equity powers. Tipson v. Jennot, 169 N. W. 874.

## Statement.

Bronson, Ch. J. This is an equitable action to invalidate ante-

nuptial and postnuptial agreements and to set aside a final decree in the estate of a deceased person. Defendants have appealed from the judgment in plaintiff's favor and demand a trial de novo. This cause was previously before this court. Charlson v. Charlson, 48 N. D. 851, 187 N. W. 418. In the previous appeal, the plaintiff appealed from an order of the trial court sustaining a demurrer to the complaint. Upon such appeal this court, through an opinion of the writer, sustained the sufficiency of the complaint as setting forth a cause of action in equity to set aside these nuptial agreements and to set aside the final decree. Thereafter, in the trial court, the defendants interposed an answer wherein it is alleged that the final decree of distribution in the estate was made in the county court, September 29th, 1919; that plaintiff made no claim for her statutory exemptions; that she received from the estate certain real property in the sum of $1,500; that she also received household furniture and furnishings and other property, which would have been exempt to the deceased if he were living, including all property absolutely exempt. The answer further alleged that plaintiff was estopped from maintaining her cause of action as alleged in the complaint by reason of the antenuptial and postnuptial agreements and by reason of her participation and acquiescence in the probate proceedings had and by reason of her conduct with relation thereto which waived all question of the jurisdiction of the county court and consented to the administration by the county court as it was in fact had; that, in addition, the laches of the plaintiff in making no objection to the probating of the estate of her deceased husband for a period of some two years, her receipt and retaining of the property distributed to her by the final decree, barred her from any right in equity to set aside such final decree.

After the evidence was adduced, the complaint was amended in some unimportant details to conform to the evidence. The trial judge made extensive findings of fact. These findings and the facts show as follows: On February 19th, 1916, plaintiff and deceased Charlson married. Then plaintiff was aged fifty-three years, deceased sixty-five years. Plaintiff was born in Wisconsin of Scandinavian parentage. Her schooling was limited. When seventeen years old she married one Larson, a farmer, with whom she lived some twenty-nine years, until his death. As a result of this marriage, plaintiff had three surviving

children. After the death of her husband plaintiff lived for several years with a married daughter at Ray, North Dakota. Plaintiff possessed no business training and could read and understand English imperfectly.

The deceased was engaged in the mercantile business at Ray, N. D. His first wife died in 1914. As a result of his first marriage, he had five adult children two of whom, a daughter and a son, were associated with him in the mercantile business. One daughter, after the death of his first wife, lived with him and supervised his household affairs. In September, 1915, the daughter employed plaintiff as a housekeeper in the home of the deceased. Prior to this time, she had only a casual acquaintanceship with deceased. Plaintiff, while so employed, received from Charlson an offer of marriage which she refused. Then, in December, 1915, she ceased her employment and returned to the home of her daughter. Charlson continued to visit her and to renew his offer of marriage. This offer was finally accepted and the date of the marriage set tentatively for the following summer. Charlson advised his children of the proposed marriage. They made objections. Plaintiff, being advised of these objections by Charlson, requested cancellation of the betrothal. Further negotiations were had by Charlson with his children. Charlson then suggested to plaintiff that the objections of the children could be obviated by a property settlement. Charlson procured the preparation of a proposed antenuptial agreement drawn by an attorney at a distance from his home town. This antenuptial agreement was presented to plaintiff by Charlson and signed by her four days before their marriage. Then Charlson explained to her that she would be provided for. She had confidence in him and relied upon his statements. At the time of the execution of this agreement, plaintiff had no knowledge of her rights of inheritance in the event she survived him, and she was not informed thereof by Charlson or anyone else.

In this antenuptial agreement, Charlson agreed to give to plaintiff during their married life the use and occupancy of the home of the deceased in Ray, North Dakota. Charlson agreed to maintain her as his wife in a manner suitable to his means and station in life. It was distinctly understood that such home should be and remain the property of the deceased, his heirs or assigns. Charlson released any and all in-

terest in property owned by plaintiff. Plaintiff released any and all claims to the property of Charlson and to any moneys or property that might go to her by his death including any statutory allowances. At the time this agreement was signed a further clause was inserted by a notary who was an attorney to the following effect: namely, that it was further distinctly understood that the home of the deceased should, upon his death, go to plaintiff in the event she survived him. When this agreement was executed plaintiff was worth about $1,200 which fact was known to Charlson. · At that time Charlson was worth approximately $50,000 which fact was not known to plaintiff. She made no inquiry of him as to his financial worth and had no independent knowledge of the same. (Generally she knew that he was engaged in the mercantile business and had some farm lands.) During their married life plaintiff and her husband lived happily together in the home at Ray, North Dakota. He well provided for her, was good and kind to her. In August, 1917, he became ill, through kidney trouble. As his demise approached and while he was at the hospital, very sick, and while some of the children were there, he inquired of plaintiff what further provision he should make for her. She, in tears, replied to the effect that anything he did would be all right. There was drawn a postnuptial agreement. Under these circumstances it was signed. It referred to the antenuptial agreement theretofore made and particularly to the terms thereof whereby the home, in the event plaintiff survived her husband, should go to her. It further provided through a desire of her husband to give to her more of a property settlement than was contemplated in the antenuptial agreement, that plaintiff if she survived her husband, should in addition to the home, as further consideration of the agreement, receive the sum of $1,500 out of his estate. Plaintiff's husband died on August 27th, 1917. When this postnuptial agreement was executed plaintiff did not possess knowledge of the financial worth of her husband. During their married life she had learned in a casual way concerning her husband's properties. She did not have knowledge that he had large property holdings in the states of Minnesota and Washington. When this postnuptial agreement was executed she made no inquiry concerning his property and no information was voluntarily given to her by anyone. After the death of her husband she continued to live in the home. A daughter of the deceased lived there

with her for a time. The daughter furnished fuel and provisions. A clerk in a store boarded there. Plaintiff kept house. After a time a disagreement arose between the daughter and plaintiff and the daughter left. After the death of her husband, probate proceedings were initiated by his children in the county court of Williams county. Plaintiff was made a party and signed a general appearance. One of the sons was appointed as administrator. Plaintiff was not represented by counsel. She took the advice of the administrator in whom she had confidence and upon whom she relied. During the course of the probate of this estate, plaintiff did not learn of the extent of her husband's estate nor of her statutory rights as widow of her husband. On April 22nd, 1918, she and the children of her deceased husband executed an agreement ratifying and confirming the antenuptial and postnuptial agreements. This agreement was prepared by an attorney of the children of the deceased without any previous arrangement or agreement had with the plaintiff. She signed this agreement at the request of the administrator relying on his statement that she would be provided for and that she should sign as all the others were signing. She relied on these statements.

The county court recognized as valid the antenuptial and postnuptial agreements on September 29th, 1919. It made a final decree. This final decree awarded to plaintiff the home which the county court, after consideration had with plaintiff and the children and the counsel of the children, determined should go absolutely to the wife, and also the sum of $1,500 and certain other absolute exemptions. Plaintiff had no knowledge of the contents of this decree except in a general way until December, 1920, when she employed counsel to investigate the matter and since that time she has proceeded with dispatch. After the rendition of the final decree the children formed a corporation composed of the children. To this corporation all the lands owned by the deceased in North Dakota, Minnesota and Washington were conveyed.

Upon these findings of fact the trial court made conclusions of law that the antenuptial and postnuptial agreements, and agreements subsequently made ratifying the same, were void and of no effect; that the provision made for the widow was grossly disproportionate to the value of the estate of the deceased; that the appearance made by plaintiff in the course of probate was made without knowledge of her rights and

in reliance upon the good faith and fairness of the administrator and that of the other children; that the final decree made in the estate was void and should be set aside; that the final discharge of the administrator should be set aside; that the administrator should forthwith proceed to further probate the estate and the county court direct—to set aside the final decree and proceed with the probate of the estate in disregard of the antenuptial, postnuptial and confirming agreements made by plaintiff; that the Charlson estate should be ordered to retransfer to defendants the real estate concerned. Upon such findings and conclusions judgment was entered accordingly.

## Contentions.

The defendants maintain that upon the record the final decree of distribution made in the county court is a binding judgment which plaintiff, through her gross laches is estopped to deny; that plaintiff has wholly failed to bring herself within the well recognized rules of law authorizing a court of equity to vacate or set aside such final binding decree of the county court; that this county court had power to pass upon and construe the rights of the parties and that plaintiff, by her failure to use due diligence, acquiesced in the exercise of that power. Further, that plaintiff was possessed of knowledge, or the means of knowledge, of property possessed by her deceased husband at the time of the execution of the antenuptial contract and at the time of the marriage; that the record fails to disclose any misrepresentations, concealment, or undue influence used upon or towards the plaintiff by her deceased husband or children concerning the antenuptial and postnuptial agreements or either of them.

## Decision.

The law of the case was announced in the former appeal. Then this court announced that the complaint was sufficient as a cause of action in equity to set aside the antenuptial and postnuptial agreements.

In that opinion the court said,—"that the marriage relation of husband and wife is one of special confidence and trust requiring the utmost good faith, and equity closely and rigidly scrutinizes trans-

actions between them to the end that injustice and oppression may not result. In such cases the principle of law is often applied that fraudulent concealment will be presumed and the burden of proof thrown on him, or those claiming under him, to show that full disclosure had been made where the provision made for the wife is grossly disproportionate to the value of the estate." It follows, from the law of the case so determined in the former appeal, that, if the allegations of the complaint find support in the evidence, the order and judgment of the trial court setting aside the antenuptial and postnuptial agreements must be sustained.

Upon a careful review of the evidence we are of the opinion that the order and judgment of the trial court should not be disturbed. The trial judge possessed a superior opportunity in passing upon the evidence presented in this cause. Although this superior opportunity does not create any presumption that the findings are correct, nevertheless, it is a circumstance not without importance where evidence must be carefully weighed. Concerning the antenuptial agreement it must be noted that it deprived the prospective wife of all interest in her prospective husband's property or estate excepting the doubtful provision concerning the home about which the county court had difficulty in interpretation. So far as this antenuptial agreement deprived the wife of her exemptions and statutory allowances it was to that extent illegal and contrary to public policy. Herr v. Herr, 45 N. D. 492, 178 N. W. 443. The postnuptial agreement, so-termed, relates to and must be considered as a part of the antenuptial agreement; otherwise doubtful questions would be presented concerning its validity. 30 C. J. 635, 638, 639. This postnuptial agreement gave to the plaintiff nothing she did not already possess of right, if she survived her husband.

Following the law of the case as announced in the former appeal, it was competent for the trial court, exercising equitable powers concerning an antenuptial agreement that released practically all of the wife's inchoate rights, to consider, whether the contract had been entered into with the utmost good faith; whether it was reasonable in its provisions; whether the prospective wife possessed full knowledge of the character and value of her intended husband's property or was chargeable with such knowledge; whether the prospective husband in-

50 N. D.—44.

formed his fiancee fully with respect to all facts concerning his property; whether the antenuptial contract provided any reasonable provisions for the support of the wife in case of her survival; whether, upon all of the surrounding circumstances, the provisions made for the wife in the contract were grossly disproportionate to the means of the husband; and whether such inadequacy of provision in the contract was sufficient under all the circumstances to raise a presumption of fraudulent concealment that was not overcome by the proof in the record sufficient to show its absence. See 30 C. J. 627, 642–644; Denison v. Dawes, 121 Me. 402, 117 Atl. 314; Liland v. Tweto, 19 N. D. 551, 563, 125 N. W. 1032. Into this legitimate field of inquiry evidence was adduced. The trial court was of the opinion that it was sufficient to show fraudulent concealment in making the antenuptial agreement. We concur in the opinion of the trial court. It appears sufficiently clear that the deceased was willing and ready to marry plaintiff without any reservation concerning his property rights or her rights that might attach thereto as his wife. The objections of the children became the occasion for the execution of an antenuptial agreement. Plaintiff was willing to forego marriage in order to avoid family troubles. The prospective husband pressed his suit and plaintiff, relying upon his assurances, executed the antenuptial agreement with practically no knowledge or information concerning his property rights or her rights as a wife. This agreement had none of the elements of a business transaction as ordinarily considered. There appeared to be a mutual affection between the parties which continued until the time of the death of the deceased. Under the circumstances we are clearly of the opinion that plaintiff is not chargeable with negligence, laches, or carelessness when, through considerations of love and affection she acquiesced in her prospective husband's request by signing these agreements, both before the marriage and at the time of the death-bed scene, without becoming querulous, assertive and mercenary concerning her husband's assets. She did not possess the knowledge of, nor receive information, concerning her husband's property. Under the circumstances she may not be charged with knowledge because she possessed the means of knowledge, which, through consideration of love, compassion and faith in others, she failed to exercise. In our opinion the facts adduced support the allegations of the complaint. Concerning

the further contentions of the defendants with relation to the estoppel and acquiescence of the plaintiff in the probate proceedings, we are of the opinion that the record sufficiently discloses her lack of knowledge concerning her rights and duties as a widow so as to justify her acts and conduct and so as not to preclude her from asserting her proper rights in an equitable action. The right of an equity court to inquire into the subject matter and to set aside a final decree of the county court has been answered in the former appeal. The judgment of the trial court is affirmed.

CHRISTIANSON, JOHNSON, and BIRDZELL, JJ., concur.

NUESSLE, J. (dissenting). I am unable to concur in the opinion of the majority of the court. The law of the case was laid down in the former opinion. The rule there enunciated that "the relation of husband and wife is one of special confidence and trust requiring the utmost good faith and equity closely and rigidly scrutinizes transactions between them to the end that injustice and oppression may not result. In such cases the principle of law is often applied that fraudulent concealment will be presumed and the burden of proof thrown on him, or those claiming under him, to show that full disclosure had been made where the provision made for the wife is grossly disproportionate to the value of the estate," is established as the law in this case. Even so, it seems to me that the facts as shown by the record do not warrant the majority opinion.

Charlson was a widower, sixty-five years of age, with a family of grown children. The plaintiff was fifty-three years old, a widow. She had lived in the same community with Charlson for some time. She knew him slightly, and knew him to be in the mercantile business, prosperous, and a man of considerable property. She accepted employment in his household, composed of himself and an unmarried daughter, at a wage of $5 per week. Later he wanted to marry her and she agreed. His children objected because of the fact that he was an old man, and if she married him she might inherit a considerable portion of his property. She knew these objections. The matter was talked over between her and Charlson, and it was decided that they should not be married. Charlson then suggested that the matter be arranged by con-

tract. He had an antenuptial contract drawn. She was a woman of little education but she could read and understand English reasonably well. Though she did not read this contract, it was read to her before she signed it, and she does not deny that she understood its terms. She was assured that as Charlson's wife she would be well taken care of. She signed the contract. She and Charlson were married. They lived together happily as man and wife for a year and a half, and she was treated nicely and well taken care of. Then Charlson died. At the time of the marriage she knew that he was well off, but she did not know how much property he had. In fact, he was worth $50,000. At that time she had property worth about $1,200. During the period of the marriage she learned considerable about his property. She knew he had a number of farms in North Dakota, and knew that he had property in Minnesota and Washington, although she did not know the value thereof. Generally, she knew about his property. He advised her that all of his land was clear of debt. She knew that he had an interest in a prosperous mercantile business. Just before his death he expressed a desire to modify the antenuptial contract in her favor. He told her about it. She assented thereto, and he did modify it. This contract as thus modified gave her as much of his property as she would be entitled to claim as his widow in the event of an attempt by him to alienate all of the property. After his death she asserted no claim to more than the amount thus given to her until after the estate had been fully settled up. When her former husband's estate was disposed of, as his widow she received a third thereof, the remainder going to their children. Thus she knew that as a widow she was entitled to a third. It is true that this estate was located in Wisconsin, and was distributed according to the laws of Wisconsin, but she does not anywhere say that she did not know that the law was the same in North Dakota. She was an intelligent woman, and it is unreasonable to say that she did not know.

It seems to me that, though the rule be as heretofore stated, the circumstances disclosed by the record wholly overcome any presumption that might arise under that rule. It must also be remembered that the rule was first enunciated and most generally followed in those states where the wife had the dower right, and where generally there was no separate property right in the wife. In this case, had she not

assented to the two agreements, Charlson could by will have attained exactly the same result attained by enforcing the agreements, and there is no doubt but that he would have done so. Charlson did not attempt to deceive her, and she was not deceived. She knew the objections raised to the marriage, and she knew that the purpose of making the antenuptial contract was to overcome those objections. On the facts as shown, it is more reasonable to suggest fraud on her part than on his in view of this lawsuit. While he did not disclose the exact amount in dollars and cents that he was worth at the time he married her, there can be no dispute that she did know that he was a man of considerable property. There can be no dispute but that when she married him she did so with the understanding that she was not to receive any more property in the event of his death than the agreement provided for. That being the case, the county court properly recognized and interpreted the two agreements. The plaintiff received that which she was entitled to. To give her more is to do injustice to a dead man who was blameless in the matter, and who acted fairly and honorably.

The judgment of the district court should be reversed.